HUDSON TRANSIT LINES, INC., Petitioner, v NEW YORK STATE HUMAN RIGHTS APPEAL BOARD, Respondent.

Second Department, December 26, 1978

### APPEARANCES OF COUNSEL

*Samuel B. Zinder, P. C.,* for petitioner.

*Ann Thacher Anderson (Alan J. Saks* of counsel), for State Division of Human Rights.

### OPINION OF THE COURT

COHALAN, J.

This is a proceeding pursuant to section 298 of the Executive Law to review an order of the State Human Rights Appeal Board, dated March 21, 1978, which affirmed an order of the State Division of Human Rights, dated May 19, 1977. The latter order was made after a hearing wherein the

present petitioner, by its agent, was found guilty of unlawful discrimination against the complainant on the basis of his national origin in a manner relating to public accommodations. The State Division of Human Rights has cross-moved for judicial enforcement of its order.

Specifically, the complaint alleged that John Bell, a bus operator employed by Hudson Transit Lines, Inc. (Hudson) violated subdivision 2 of section 296 of the Executive Law. That statute insofar as pertinent, reads: "2. (a) It shall be an unlawful discriminatory practice for any person, being the * * * employee of any place of public accommodation * * * because of the * * * national origin * * * of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations * * * thereof".

At the hearing before an examiner the testimony disclosed that on August 22, 1975 Eugene Dawson and his wife, both of whom are of American Indian descent, purchased round trip bus tickets at Middletown, New York, for passage to and from New York City. Each ticket contained a specific destination, to wit, "New York City" and "Middletown", and could not be used for the other destination.

The couple planned to board an 8:00 P.M. bus. Arriving at the terminal at 7:50 P.M., they stationed themselves outside the waiting room at the head of a line which shortly thereafter developed behind them.

When the bus driver approached the couple, Mr. Dawson handed him the two tickets which called for transportation between New York City and Middletown. The driver informed him that he had the wrong tickets and requested that he retire with his wife to the end of the line until the other passengers boarded.

Dawson took umbrage at the driver's attitude, which he later described as "nasty", and refused to accede to the instructions. At that point his wife produced the proper tickets from her purse and the two asked for leave to board. The driver refused and repeated his instructions. When the Dawson couple remonstrated the driver said, "Now you're not getting on the bus, at all. Wait for the next bus."

The couple claimed they were easily recognizable as American Indians. Both wore Indian headbands and both had coarse black hair. The wife additionally had her hair in long braids, Indian style, with interwoven ornaments. They had traveled regularly on the same bus system for a period of 25 years

without any prior incident of this nature. Too, it should be noted that the bus driver had been employed by Hudson for six years and had an untarnished record.

In contrast to the explanation vouchsafed by the Dawsons, the bus operator testified that it was the complainant (on whose breath he smelled alcohol) rather than he, who was abusive, and that for the comfort and safety of the other passengers he refused the accommodations to the complainant and his wife. Dawson, in his testimony, had stated that he had consumed one beer with his evening meal. Bell said that his refusal had nothing to do with their dress or color or national origin and that he had no particular recollection of how they were dressed, but that Mrs. Dawson was not wearing a head-band at the time. He conceded that he had left them behind at the terminal because of what he characterized as Dawson's belligerent attitude, and that he was merely following company procedure in conformance with rule number 8 of section A3 of the National Passenger Tariff of the Interstate Commerce Commission. As relevant, that section states: "Carriers reserve the right to refuse to transport a person under the influence of intoxicating liquor * * * or whose conduct is such or is likely to be such as to make him * * * objectionable to other passengers".

As already noted, the gravamen of Dawson's complaint is that he was discriminated against on the ground of his national origin.

We have searched the record carefully but have found not even one single slighting reference with regard to national origin. Assuming, *arguendo,* that Bell was "nasty" as claimed by the Dawsons, such an attitude, standing by itself, does not fall within the four corners of the statute with respect to discrimination.

Excerpts culled from the cross-examination of Eugene Dawson illustrate this point:

"Q You state that he didn't let you on the bus, 'Because he identified us as American Indians and —'

"A That's just the way I feel about it. * * *

"Q Did he say anything, did he call you an American Indian?

"A No, but with that nasty attitude, that's not you know, to get down to the end of the line like you're down in Alabama or something.

"Q Is it your position that anyone who talks to you in what you believe to be abusive or nasty language is doing so because you're an American Indian, or of American Indian descent?

"A No, that's not the point of it. The point of it is he was nasty, if you were Indian or anything else, that was the point of it. He's a public assistant to drive the bus not to identify anyone.

"Q Right, He did not make any derogatory comments to you with regards to your being a [sic] American Indian.

"A. No. * * *

"HEARING EXAMINER: As far as color of skin, were you of the same color, skin color as the other passengers that were standing there?

"THE WITNESS: No.

"HEARING EXAMINER: What was the difference in color?

"THE WITNESS: Yes, *they were mostly* all white, Caucasian, whatever you want to call them." (Emphasis supplied.)

The remainder of the colloquy is in a similar vein. At no time could or did Dawson say that any mention whatever was made of his color, his race, his national origin, or of any other item enumerated in subdivision 2 of section 296 of the Executive Law.

Even on cross-examination Dawson's temper flared at what he considered an insulting remark:

"Q When you state here that 'I'm an American Indian and easily identifiable as such', is that based upon your headdress?" (after colloquy, the answer)

"THE WITNESS: It's based on my *headdress* and looks." (Emphasis supplied.) (more colloquy and an addition to the answer)

"THE WITNESS: It's a headband, a headdress got the feathers on it. What are you trying to be, funny?"

Based on these examples, if the courts were to indulge every member of a minority who feels subjectively slighted, then any such thin-skinned person could reap a windfall harvest.

At bar it would appear that Mr. Dawson had a kind of Cyrano syndrome. He imagined that any harsh words directed to him were so spoken because of his Indian background, even though, as here, his own admissions do not support his subjective reactions.

In our opinion the record, considered as a whole, fails to support by substantial evidence the finding that the complainant was treated as he claimed because of his national origin. The record is completely devoid of proof on that score. He failed to sustain his burden (see *Matter of Nescott of East Islip v State Div. of Human Rights*, 27 NY2d 787; *Matter of State Div. of Human Rights v Bystricky*, 30 NY2d 322; *Matter of New York Tel. Co. v Wethers*, 36 AD2d 541, affd 30 NY2d 791; *Matter of Antarenni Inds. v State Human Rights Appeal Bd.*, 38 AD2d 948; see, also, *Matter of Martin v Bates*, 65 AD2d 818).

Accordingly, after review of the record, the orders of the two State agencies should be annulled and vacated and the cross motion for judicial enforcement should be denied, all on the ground that there was no substantial evidence to support the claim that discrimination was practiced against the complainant because of his national origin.

LATHAM and TITONE, JJ., concur; HOPKINS, J. P., and MARTUSCELLO, J., dissent and vote to confirm the order of the State Human Rights Appeal Board and to grant the cross motion for enforcement, upon the ground that there was substantial evidence to support the determination.

Order of the State Human Rights Appeal Board, dated March 21, 1978, and order of the State Division of Human Rights, dated May 19, 1977, annulled, on the law, without costs or disbursements, cross motion by the State Division of Human Rights for enforcement of its order denied, and complaint against petitioner dismissed.